PROVO STY, J.
Plaintiffs are the judgment creditors 'of the defendant Nolle Ohachere and of his mother, Mrs. Lucile Chachere. They bring this suit to set aside a sale by him to her of three tracts of land, and likewise to set aside a sale by her of the same lands and also of another tract to her daughters Mrs. Burleigh and Mrs. Smith, as being simulations designed to screen the property from the pursuit of creditors, and in the alternative, in the event said sales are held not to have been simulations, then to set them aside as in fraud of creditors, and finally, in ease neither of said demands can be maintained, then to set aside said sales on the ground that the property was sold at one-fifth less than its value.
The facts are as follows: The defendant Nolle Chachere kept a saloon in the village of Lewisburg, about a mile from Bellevue, where he and his mother, aged 65, owned adjoining tracts of land upon which they lived. His tract contained 75 acres; hers 105. He owned also the store building at Lewisburg in which he kept his saloon. With his mother lived her daughter Mrs. Burleigh and the latter’s husband, who cultivated his mother-in-law’s said land in com and cotton. On what terms, whether as tenant or otherwise, the record does not show. Her other daughter, Mrs. Smith, and the latter’s husband, lived at Sunset, about six miles from Bellevue. Mr. Smith was in the mercantile business, on a small scale, as we gather. Nolle Chachere had not been very successful in his said business; from time to time he had had to seek financial aid from his mother. In January, 1912, she signed jointly with him four notes of $250 each in favor of the plaintiff J. Grossman’s Sons, and she had lent him her signature on other notes. In May, 1912, she let him have $1,000, which she had borrowed for that purpose from the St. Landry State Bank by mortgaging her said homestead. On November 25, 1912, one of the plaintiffs in this suit, Lon A. Bernard, brought suit against her son in the district court on several notes aggregating about $250 in capital, interest, and attorney’s fees. He had then ceased making payments to his creditors. On December 3, 1912, another creditor, F. L. Sandoz, brought suit against both him and *669 her in the city court on a note of $131, signed by them jointly. The next day, December 4, 1912, by act passed before the lawyer notary employed by him to defend the Bernard suit in the district court, he made the sale in question to his mother. The three tracts of land are described by metes and bounds, and as having buildings and improvements upon them, and as containing, one of them, 13 acres, another, 7 acres, and the third, 55 acres; two of them contiguous to the said homestead of the vendee.
The act recites that the price is $2,990; and that in payment of it the vendee has paid $1,400 cash and assumed the payment of six notes of $265 each, given by the vendor for the purchase of the same property from Joseph Smith. Two years previously, on December 27, 1910, the said vendee, Mrs. Chachere, had sold these three tracts by the same description to Joseph Smith, father of Mr. Smith, the husband of her daughter Mrs. Smith, for $3,650, whereof $1,000 cash, and the balance on a credit secured by mortgage on the property. On February 8, 1912, Jos. Smith had sold this same property, by the same description, to Nolle Chachere at the same price of $3,650, whereof $1,265 cash, and the balance by assuming the mortgage resting upon the property in favor of his mother. This mortgage is the same which Mrs. Chachere assumed in part payment of the price of the hereinabove mentioned sale by her son to her. At about this time, Nolle Chachere sold the building in which he had kept his saloon at Lewisburg, but whether before or after this sale to his mother, the record does not show. Notwithstanding the recital to the contrary in the act of sale, Mrs. Chachere did not, as a matter of fact, pay $1,000, or any amount whatever, cash, at the passage of the act of sale; but, as she and her son testify, the $1,000 said to have been then paid cash was in reality the $1,000 she had borrowed from the St. Landry Bank and lent him; and the remaining $400 said to have been paid cash was paid only some time later, if ever at all. On December 10, 1912, the plaintiffs in this suit, J. Grossman’s Sons, filed suit in which they obtained the judgment for $1,000 and interest which they are now seeking to enforce. On January 15,1913, the defendant Mrs. Chachere borrowed $1,500 from Edward M. Boagni by mortgaging her 105-acre homestead, and out of this money paid, as she testified, the debt of $1,000 to the St. Landry Bank, and $400 to her son. On March 8, 1913, Mrs. Chachere executed an act of sale in favor of her two daughters Mrs. Burleigh and Mrs. Smith, purporting to transfer to them, in consideration of $5,000, the three tracts of land which her son had transferred to her, as well as her own homestead of 105 acres, thereby divesting herself of all property she had liable to seizure. The act recites that the said $5,000 was paid $1,-910 cash, $1,500 by assumption of the mortgage theretofore executed in favor of Edward M. Boagni, and the balance by the execution of the notes of the two daughters secured by mortgage on the property sold. On the day on which this cessio omnium bonorum was made, but only after the sale had been consummated, the citation in the suit of the plaintiffs J. Grossman’s Sons, filed months before, was served on Mrs. Chachere, as well as the citation in another suit, both of which citations had been held up by the sheriff, at the request of Nolle Chachere. He assigns on the witness stand, as the reason why he prevailed on the deputy sheriff not to serve these citations on his mother, that he had hopes, of being able to pay the debt; but the fact that the service of the citations was withheld so long, and was made just as soon as the sale had been consummated, in the evening, of the same day, is too significant for the court not to understand what the true reason was.
[1] Whether the sale to the mother was or was not intended to be a final transfer of the property, we have no doubt at all that it was *671 not intended to tie a mere simulation, but a real contract. We believe the mother when she testifies that she “had paid out a grpat deal for Nolle,” had “given him several thousand dollars,” had “many times signed his note and paid out all I could,” and that she “just simply took this property from him to protect the indebtedness he owed” her “and the money” she “had given him and debts” she “had paid.” Perhaps the contract was .a mere contract of security, and probably was, since no reason is otherwise assigned why Nolle Chachere should have desired to divest himself of this property which he had but recently acquired, nor the mother to reacquire it after having two years before sold it; and, moreover, there must have been due one year’s interest on the notes, unless Nolle Chachere had paid this interest in advance to his mother, the holder of the notes — a thing very unlikely, since he had been borrowing money from her — and yet this interest does not seem to have been taken into computation at all; however, the contract was, we are satisfied, a real contract, though possibly not a sale.
[2, 3] There is no positive evidence that Mrs. Chachere knew of her son’s insolvency; but we are satisfied that she did. In cases such as this, “it will not be necessary to establish positive knowledge in the obligee of such insolvency; proof of circumstances, tending to produce a strong impression that he was aware of it, will suffice.” De Blanc v. Martin, 2 Rob. 38. The very anxiety of the old lady to secure protection for her claim shows that she understood what the situation was.
She undoubtedly sought to obtain a preference over the other creditors of her son, knowing that his financial condition made this necessary; and this lays the contract open to annulment at the suit of the creditors of her son. C. C. 1983.
[4] As to her pretended sale to her daughters, we have had no difficulty whatever in reaching the conclusion that it was a pure | simulation. It was a cessio omnium bonorum, and, except to put this property beyond the reach of plaintiffs and of the other creditors who were suing her, there was no reason whatever why she should have made the sale. The one assigned by her, that her children could better than she make the property productive for paying the mortgage debt of $1,500 resting upon it in favor of Mr. Boagni, is worse than none at all, since it is disproved by the circuipstances, and the fact of its having been assigned as the sole reason shows the absence of any other. The circumstances are that, after the sale, her son .continued to live upon and cultivate one of the tracts of land as he had done before, and she continued to occupy her homestead as she had done before, and her son-in-law continued to live upon and cultivate it as he had done before; and no explanation is offered why she, who had been assisting her son to the amount of several thousand dollars, and had just borrowed this $1,500, could not have managed to pay this $1,500 when it would fall due a year hence.
The daughters had no money to buy the property with. One of them, Mrs. Burleigh, testifies that she borrowed her half, $955, from her husband; and that he had it from having sold his crop and some mules. The other daughter, Mrs. Smith, says she borrowed $555 from her husband; that the other $400 was money of her own. To the question, “Where did you get it?” she answered:
“When I married I had a horse and buggy, and I sold it. And I had a few head of c-attle I sold, and I sewed and had worked in the store and had this money put up.”
She says her husband did not know she had this money until a few days before the sale, when she spoke to him about buying the property, and asked him to let her have the balance. Of course this is possible, but how very improbable.
As already stated, no change whatever took *673 place in the possession of the property. Another very significant circumstance, one which of itself, almost, is sufficient to serve as the straw which is said by this court, in the case of Johnson v. Mayer, 30 La. Ann. 1203, to show in cases of this kind the direction of the wind, is that instead of simply paying the $1,910 cash to their mother on passing the sale, which would have been the obvious thing to do if the purpose of the transaction had been simply what on its face it purports to be, each of the daughters, who had never drawn a check before and never drew one since, and who had not a cent in bank, and probably had never in their lives had any money in any bank, drew her check on the Bank of Sunset for $955, in favor of their mother, and the latter indorsed the checks, and then Mr. Smith, one of the husbands, took the $1,910 and the checks and traveled six miles over country roads to Sunset, deposited the $1,910 in exactly equal parts to the credit of each of the purchasing ladies, then cashed the checks, and straightway traveled back six miles over country roads to Bellevue and turned the $1,910 over to Mrs. Ohachere. And the old lady says she has since then been keeping that sum of money in her house, and that the house is sometimes left to itself with that money in it and no one near to guard it.
The discrepancy in. the price of this sale and that at which the three tracts had been recently sold, is also very significant. The price of the sales to Jos. Smith and by the latter to Nolle Ohachere had been $40.80 per acre. The price of this sale was $27.77 per acre. The properties had not decreased in value.
In cases of this kind courts have to be guided largely by the attending circumstances. The positive testimony of the parties to the transaction that is attacked as to their good faith, etc., is not considered to be conclusive. If it were otherwise, in nearly all the cases creditors would have little chance of succeeding in uncovering the property of their debtors. When debtors resort to simulated sales for the purpose of putting their property beyond the reach of their creditors, it is not usually with a view to admitting the simulated character of the transactions when questioned in that regard.
It is therefore ordered, adjudged, and decreed that the judgment appealed from is set aside; the sale made on the 8th of March, 1913, by the defendant Mrs. Ohachere to her daughters, the defendants Mrs. Burleigh and Mrs. Smith, is set aside and annulled, and the inscription of it on the public records is ordered canceled; and the sale made by the defendant Nolle Ohachere to the defendant Mrs. Ohachere on December 4, 1912, is annulled in so far as it affects the rights of the plaintiffs in this suit; and that the defendants pay the costs of this suit.